Alexander Del Giorno, J.
This is a claim to recover damages “for the wrongful acts of the State of New York, its officers, agents and employees in unlawfully arresting, detaining and falsely imprisoning the claimant herein in and about the Town of Wallkill, Orange County, New York, and at the Middletown State Homeopathic Hospital at Middletown, New York.”
Claimant testified that on August 9, 1955, at about 8:00 p.m., he went to the Orange County Fair. "While there he engaged in a game which consisted of throwing balls into a barrel, having paid a fee to play. During the course of the game, a dispute arose between claimant and the concessionaire as to whether claimant had Avon a certain prize. Upon the suggestion of the concessionaire, they proceeded toAvard a tent set up on the fair grounds and occupied by the State Troopers, and on the Avay met Trooper Ehre, avIio, after conversing with them, took them to the tent. Inside the tent, Sergeant William Hanley Avas on duty. A discussion ensued as to the ownership of the object in question, a clock, which Avas held by claimant. One of the troopers asked claimant to put the clock doAvn, but claimant refused to do so and instead threAv the clock to the ground and stepped on it. Ehre and another trooper then threw claimant to the ground, handcuffed him and sat him on a chair after claimant had resisted them for 15 minutes. Claimant asked the sergeant if he Avas Irish, whereupon, claimant testified, the latter struck him four times in the eye and face. Claimant then stood up and hit the sergeant on the chin Avith his elbow, causing the sergeant’s eyeglasses to fall. Then, while the troopers held' claimant, the sergeant struck him once on the back Avith a blackjack; Avhen claimant turned, he Avas struck in the stomach by the sergeant’s fist. Thereafter claimant Avas compelled to lie-down for one hour on the floor of the tent, Avhile Trooper Ehre Ava-s at a typcAvriter. Another trooper, Schultz, then told him to get up and sit in a chair. After 15 minutes, the troopers told claimant they Avere all going* for a ride; Avith Ehre driving and Hanley on his right, claimant was taken to the home of a Judge but never left the oar he had been driven in. Only Ehre entered the house, who stayed five minutes and then came back to the car, at Avhich time claimant Avas told they Avere taking him *218 to a doctor. Instead, he arrived at Middletown State Homeopathic Hospital, where he was placed in the custody of hospital officials.
There was introduced into evidence an order of commitment for observation and examination, dated August 9, 1955, signed by Justice of the Peace Harold B. Hulse. It is to be noted that although this order refers to a previous order made on August 9, 1955, there was in fact no such previous order.
There was a further order requiring an examination of claimant by two psychiatrists and directing a report to be made thereof to Judge Hulse. This order was signed by Judge Hulse on August 10, 1955. It recited that claimant, charged with disorderly conduct, was in such a state of idiocy, imbecility or insanity as to be incapable of understanding the proceedings.
A further order, signed by Judge Hulse on August 10, 1955, referring to the prior order of August 10, 1955 and based upon the recommendation and request of the superintendent of the hospital, directed that claimant be committed to the hospital for mental observation for a period of not more than 60 days.
Claimant testified that although he was told in the police tent that he was charged with disorderly conduct, he was not taken before a Judge, nor did he see Judge Hulse at any time prior to a subsequent habeas corpus proceeding.
After he was admitted to the hospital, claimant was placed in a ward with 9 or 10 others who were patients, some of whom were in strait jackets. He asked the doctor and orderly for permission to call his mother, but this was refused. There was one door to the room and the windows were barred. On the second day of his confinement he was given a uniform and allowed to walk about in the ward, but was not permitted to shower or shave; on the third day, his clothes were returned to bim and he was allowed to go to the recreation room to watch television, and on this day a doctor permitted him to call his mother. As a result of this call, an attorney visited him that night between 9:00 p.m. and 10:00 p.m. The following day he was allowed to go about the grounds with guards.
On August 17, 1955, he was taken to the chambers of the Special County Judge at Monroe, New York, by three orderlies, on a habeas corpus proceeding brought 'by his attorney. This hearing, he testified, lasted from 2:00 p.m. on that day to 1:00 a.m. of the following day.
An order, dated August 17, 1955, signed by Special County Judge Edward M. O ’Cormas, sustained the writ of habeas corpus granted on August 15, 1955 and discharged claimant *219 from custody. No appeal was taken from this order by the State.
Claimant testified that the story concerning the incident appeared in Kingston and Middletown papers; that people discussed his arrest; that since November, 1958 he has been unable to obtain employment because of his confinement in the hospital. He has no trade or usual occupation.
The sole physical result of his treatment was that his right wrist was swollen to twice its normal size because of the use of handcuffs.
On cross-examination, he denied that he became excited at the time of the incident. Admitting that he is of nervous temperament, he said that he had worked from 1955 to 1958, making knives at a factory in Ellenville, but had been discharged because of a condition from which he suffers, something “ very close ” to epilepsy.
He was convicted on October 14, 1955 of disorderly conduct as a result of the incident herein on a later complaint alleging the same facts as in the first complaint.
In an affidavit sworn to November 11, 1955, constituting the basis of an unperfected appeal from this conviction, he alleged that he “was brought before Justice Harold B. Hulsb, and arraigned at the site of the alleged crime ’ but ‘1 that prior to the completion of the arraignment your deponent was committed to Middletown State Hospital for observation by Justice Hulsb. ’ ’ He reiterated his denial, however, even in the face of this statement, that he saw Judge Hulsb that night.
On redirect, he stated that he did not know what the word “ arraignment ” means, and that he does not remember signing this affidavit.
When he was 15 or 16 years of age, he was treated for epilepsy, but was not treated again for that condition until 1958. When he left his job in 1958, it was because of epilepsy. He later saw a doctor, who recommended certain pills, the purpose of which was to regulate the effect of other medicine he was taking. He insisted that no doctor ever diagnosed his condition actually as epilepsy, but stated that at the hospital, when after two days they gave him his medicine, they kept changing the dosage of dialacetin and phenobarbital.
John J. Schick, attorney for claimant, testified that after he was retained by claimant’s mother, he interviewed the superintendent of the hospital, the State troopers and Judge Hulsb. The Judge told him that claimant had been arraigned without counsel or a doctor being present. The habeas corpus proceed *220 ing lasted from 2:30 p.m. on August 17 to 1:30 a.m. on August 18. He testified on cross-examination that in the habeas corpus proceeding he relied solely on the ground that the information was invalid because Judge Hulse had not sworn a witness. On redirect, he stated that other grounds which could have been advanced were that the detention was illegal because there was no arraignment; that the order of Judge Hulse dated August 9, 1955 on its very face was false, and known by the Judge and troopers to be false, because it gave the impression there had been a prior order based upon the superintendent’s recommendations, when in truth there had been no such prior order; also, on the ground that the doctor at the hospital knew the order to be false because claimant had not been known previously at the hospital.
Claimant then rested, and the State moved to dismiss upon the ground that no prima facie case had been established by claimant. Decision thereon was reserved.
On behalf of the State, Judge Hulse testified that at about 10:00 p.m:. on August 9,1955, he received a call from the troopers and went to the police tent, where he saw the sergeant, the troopers and the claimant. The sergeant presented to him the information which he did not read because he first wanted claimant to rise from the ground where he was lying prone. When he did get up, claimant seemed to Judge Hulse to be “ flighty ” and unable to understand the proceedings. The Judge then told the troopers to take claimant to his home. There, also, claimant did not understand what was transpiring. Thinking that claimant was sick, he made the order committing claimant to the hospital. This took place at his home, while claimant was still in the oar outside. He interrupted what he termed the arraignment because he believed that claimant could not understand the proceedings.
On cross-examination, he testified that he read the information to himself, but it was not sworn to or signed by Trooper Ehre. He did not tell claimant he was a Justice of the Peace, nor did he advise him of his rights, because claimant was incapable of understanding. The information charged disorderly conduct. The witness was not in contact with any lawyer or doctor before he signed the order of commitment. On August 10 he signed the order for examination of claimant and report, at the request of the hospital. Referring to the order of August 10 committing claimant, he testified he could not now understand why he made two orders the same day.
He testified further that at the tent he thought claimant’s condition was good enough to allow him to be taken to his home *221 for arraignment; when he reached his home in his own car, he asked ¡the troopers to bring the claimant inside, but they told him claimant was not well. Taking this to be true, ho executed the commitment order without arraignment. He stated that he had made up his mind at the tent what to do, and the subsequent procedure was for the purpose of formalizing the proceeding.
John Ehre, State trooper, testified that on August 9, 1955, at about 10:00 p.m., while on patrol, he found the claimant and the concessionaire in a verbal altercation. Determining the cause of the controversy, he asked both to come to the troopers’ tent, 100 feet south. The tent was 20 feet by 20 feet in size, with a wide open front. In the tent, when the matter could not be settled, the sergeant asked the concessionaire if he wanted to make a charge of petty larceny. When the latter replied in the affirmative, the claimant turned to Ehre, called him some foul names, smashed the clock to the ground and stamped upon the clock. He then started to swing at Ehre, unheeding of the trooper’s plea for quiet. The sergeant then telephoned Judge Htjlse. Troopers Schultz and Ehre were unable to restrain the claimant. As they were attempting tó handcuff him, the sergeant informed claimant he was under arrest for disorderly conduct. The claimant continued fighting for about 15 minutes. When Judge Hulse arrived, between 10:30 and 11:00 p.m., the witness handed the Judge the information charging claimant with a violation of subdivision 1 of section 722 of the Penal Law, because a crowd of 15 to 20 people had gathered outside the tent. The witness stated that he himself did not strike claimant, that the sergeant did not strike him, that no one struck him. When refusing to be handcuffed, claimant fell against a chair. At the time Judge Htjlse arrived, claimant was on the floor of the tent because he had thrown himself there. The troopers had previously sat him upon a chair. When Judge Hulse proceeded to 1 ‘ arraign ’ ’ claimant, the latter remained upon the ground, kicking and shouting, whereupon the Judge directed that claimant be 'brought to the Judge’s home. Subsequently, Judge Hulse directed Ehre to bring claimant to the hospital.
On cross-examination, he testified that after claimant stamped upon the clock, he threw punches at him and Trooper Schultz. At this point, the attorneys stated to the court that the information drawn by the witness had been attached to the habeas corpus papers, but that a search had failed to disclose what had. happened to all the papers in that proceeding. The witness testified that at the home of Judge Hulse, he said nothing to the Judge relative to the claimant’s being sick so as to prevent his coming into the house for arraignment. When they left the *222 Judge’s home, Sergeant Hanley said he was going to notify the parents of claimant of the situation.
Sergeant Hanley, now retired, testified that he did not strike claimant, but rather was struck by him, causing his glasses to fall. He reiterated previous testimony to the effect that claimant was in a highly excited condition, shouting, kicking and punching wildly. He quoted Judge Hulse as saying: “Bring him to my house, I’ll make the commitment to the hospital.” He denied that he or any trooper suggested or requested commitment. He stated that when the Judge attempted to read the information, claimant was standing. When an Assistant District Attorney came in that night, he suggested presenting a case against claimant to the Grand Jury for assaulting an officer.
The sergeant called claimant’s mother, advising her of what had happened. She said to him: ‘ ‘ Did he have one of his spells, did he have his medicine with him? ” Then, he testified, they realized claimant’s troubles and for that reason did not press assault or petty larceny charges. He informed the mother that claimant had been taken to the hospital. In a report by Trooper Ehre, which was part of an entire official report, there was a statement to the effect that the sergeant had called the parents and had been told that claimant suffered from epilepsy and had been under the care of a doctor for a long time. The sergeant advised that the doctor be told to contact the hospital. The sergeant was unable to state on cross-examination, however, whether he called the mother that evening, the next day or the following day.
The State then rested and renewed the motion to dismiss the claim, upon the ground that claimant has not established his claim by a fair preponderance of evidence; upon the ground that the notice of intention was not filed within the prescribed statutory period, and that claimant did not move for leave to file a late claim for alleged assault occurring on August 9, 1955.
At the outset, it is essential for the court to determine if the notice of intention and the notice of claim were timely filed so as to confer jurisdiction upon the court. While the State stresses the point that the claim of assault was filed beyond the two-year period, it must be noted that the notice of intention signified that a claim would be made for false imprisonment in the hospital from August 10, 1955 to August 17, 1955 and false imprisonment in the police station on August 9, 1955; the notice of claim specified the wrongful acts of the State as unlawful arrest, unlawful detainer and false imprisonment. There is no claim made for assault upon the claimant therein, and upon the *223 trial, claimant’s counsel indicated specifically that the claim was principally for unlawful detention. Even if there were a claim for assault, however, it is clear that all of the acts complained of, resulting in claimant’s commitment, together constitute one act in that they occurred as part of one entire incident. They cannot be considered to have been separate acts, one apart from another.
The incident commenced on August 9, 1955. Claimant was taken to the hospital the same night. The claimant was discharged from custody on a writ of habeas corpus by order dated August 17,1955. The notice of intention was filed on November 14, 1955. The claim was filed on August 15, 1957. The claim accrued on the date of the discharge of the claimant from the hospital on August 17, 1955. (Warner v. State of New York, 189 Misc. 51, mod. 297 N. Y. 395.) Since claimant elected to file a notice of intention, it was filed validly within 90 days, and the claim itself was filed validly within the two-year period. A person detained in a State hospital is under a legal disability at the time his cause of action, if any, accrued. Whether or not his confinement was legal, his detention in the hospital placed him under a legal disability until released. (Jones v. State of New York, 206 Misc. 788.) The court thus finds that the claim was timely filed and that the Court of Claims has jurisdiction thereof.
An information, the allegation made to a Magistrate that a person has been guilty of some designated crime, is the foundation on which his jurisdiction rests. (People v. Sas, 172 Misc. 845.) It must be verified. (Code Crim. Pro., § 145; People ex rel. Livingston v. Wyatt, 186 N. Y. 383; People v. Scott, 3 N Y 2d 148; People v. Sledge, 192 Misc. 934.) Unless it is verified a Justice of the Peace does not acquire jurisdiction. (Matter of Bennett, 258 App. Div. 368.)
A Justice of the Peace is a Magistrate. (Code Crim. Pro., § 147, subd. 5; People v. Black, 156 Misc. 516.)
If a Magistrate having jurisdiction of a defendant charged with a misdemeanor or a felony but not under indictment therefor, or charged with an offense which is not a crime, has reasonable ground to believe that the defendant is in such a state of idiocy, imbecility or insanity .that he is incapable of understanding the charge or proceeding or of making his defense, he may in his discretion order an examination of defendant to determine the question of his sanity. (Code Grim. Pro., § 870.)
Accepting the State’s testimony to the effect that he was present in the police tent, nevertheless Justice of the Peace Htjlse never acquired jurisdiction of the claimant, because the *224 information which was presented to him and. upon which he acted was not verified. Section 870 of the Code of Criminal Procedure could not be invoked by him so as to commit claimant for examination as to sanity, because the provisions of that section presuppose that the Magistrate has acquired jurisdiction.
Further, even assuming the information to have been valid, a defendant must have been arraigned before the court (Code Crim. Pro., § 296). The evidence is clear that no such arraignment ever took place. The claimant was not arraigned in the tent on the Fair Grounds, but rather the Judge told the troopers to bring claimant to his home. Upon arrival at his home, claimant remained outside in the car while certain proceedings transpired within the home between the Judge and a trooper, after which claimant immediately was taken to the hospital.
Since the Judge never acquired jurisdiction of claimant, he was powerless to cause his commitment to the hospital, and such commitment was invalid.
While the troopers deny that the Judge was told by them that claimant was too ill to be brought into his home, or that any trooper suggested to the Judge that claimant be committed, nevertheless they knew or should have known that the information furnished to the Judge at the outset, not having been verified, was invalid. They knew also, then, that any act d'one in furtherance of an originally invalid information was necessarily also invalid.
The court will now consider the acts of the hospital. It is true that ordinarily a commitment valid on its face is sufficient to enable the superintendent of a hospital to admit a person to the hospital. The State contends that such is the situation here.
The order of commitment, dated August 9, 1955, provided that claimant be committed to the Middletown State Hospital for mental examination. This order recited that another order had been made on August 9, 1955, directing the mental examination of claimant; that the superintendent of the hospital had been requested to examine him and that the superintendent had recommended that claimant be committed for examination. No such order had been made, no such request had been made of the superintendent and no such recommendation had been made by him. The order of commitment therefore was not valid on its face, but false on its face. The superintendent of the hospital must be charged with knowledge of its falsity because he knew or should have known that there had been no prior order, that he had not been requested to examine claimant previously, and that he had not recommended commitment.
*225 On August 10, 1955, the Judge, on the ground that there was reason to believe claimant, charged with disorderly conduct, was in such a state of idiocy, imbecility or insanity that he could not understand the proceedings or make his defense, ordered that claimant be examined as to his sanity, and that the superintendent of the hospital cause such examination to be made; then, on the same date, referring to the other order of August 10,1955 directing such mental examination, the Judge ordered the commitment of claimant. The Judge testified that the first order of August 10, 1955, was signed at the behest of the hospital; referring to the second order of August 10, 1955, he said he could not understand why he signed two orders on the same day.
The invalid order of commitment dated August 9, 1955 was not validated in any way by the subsequent orders of August 10, 1955. Under the circumstances, the State was not absolved from its liability incurred when it participated in claimant’s original arrest and detention. The only way in which the State could have been protected from liability to claimant from the original date of his incarceration would have been to restore him to his liberty, thus terminating his previous illegal detention, and then procuring his commitment in a legal and orderly manner. (Warner v. State of New York, 189 Misc. 51, supra.) This it failed to do, but rather attempted to protect itself by having a patently invalid commitment corrected by what it apparently thought was a subsequent valid commitment.
The court is aware that the actions of the claimant, whether induced by a deteriorated mental condition caused by a form of epilepsy or by a predisposition to violent action, must have been most trying to the authorities, whom the court hereby compliments for their patience. But that situation cannot be held to excuse absolute compliance with the law or to sanction the incarceration of claimant without due process of law.
The State relies upon the case of Mudge v. State of New York (271 App. Div. 1039) for the proposition that there was no false imprisonment or unlawful detention herein. In that case the State police arrested claimant on a warrant issued by a court having jurisdiction. The court held that the Magistrate who ordered his confinement had jurisdiction to cause his further detention for an examination as to his sanity under section 870 of the Code of Criminal Procedure. The court held further that claimant’s other period of detention, while en route from the county home, in the custody of the State trooper, for formal arraignment before the Magistrate, “ had jurisdictional sanction under claimant’s original arrest and also under the war *226 rant of arrest which subsisted, which had theretofore been jurisdietionally issued and had not been spent.” That is not the situation here. In conferring authority upon the Magistrate to -canse detention for an examination as to sanity section 870 of the Code of Criminal Procedure provides in so many words that the Magistrate have jurisdiction of the defendant. The Magistrate had no jurisdiction of claimant in the first place, and the arrest was made by the State police without a warrant.
Furthermore, the order on the writ of habeas corpus, issued by the County Court of the County of Orange on August 17, 1955, sustaining the writ and directing the discharge of claimant from custody, necessarily determined that the detention was unlawful. (Williams v. State of New York, 16 Misc 2d 109, affd. 9 A D 2d 415, 417-418.) In the. Williams case, the Appellate Division held: “ The order in the habeas corpus proceeding, from which no appeal was taken, constituted a conclusive adjudication that the order of commitment was void and that the imprisonment thereunder was illegal (Post v. Lyford, 285 App. Div. 101; Nastasi v. State of New York, 275 App. Div. 524, affd. 300 N. Y. 473).” The court held further: “ The information filed by the State Trooper on the license charge did not state facts sufficient to constitute the crime charged. The State Trooper thus committed an illegal arrest, followed by the filing of a void information, and the obtaining of a void commitment. Under these circumstances, the State Trooper’s responsibility, and correspondingly the liability of the State, continued throughout the period of detention. An analogy may be formed in the cases holding that a complainant is liable for false imprisonment if he files an information which does not state facts sufficient to give jurisdiction to the Magistrate and procures from the Magistrate a void warrant of arrest and thereafter participates in the making of the arrest under the warrant (Hewitt v. Newburger, 141 N. Y. 538; cf. Swart v. Rickard, 148 N. Y. 264; Blodgett v. Race, 18 Hun 132).”
The court finds therefore, that claimant was illegally arrested and illegally committed and that the State is liable. An award is made to claimant in the sum of $3,500.
All motions heretofore made by the State on which decision was reserved are hereby denied.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act. Let judgment be entered accordingly.